UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DONNA FANTONI,                          :
          Plaintiff,                    :
                                        :
     v.                                 :        CA 07-005 ML
                                        :
MICHAEL J. ASTRUE,[1]                   :
COMMISSIONER, SOCIAL                    :
SECURITY ADMINISTRATION,                :
          Defendant.                    :

## REPORT AND RECOMMENDATION

David L. Martin, United States Magistrate Judge

     This matter is before the Court on a request for judicial
review of the decision of the Commissioner of Social Security
("the Commissioner"), denying Disability Insurance Benefits
("DIB"), under § 205(g) of the Social Security Act, as amended,
42 U.S.C. § 405(g) ("the Act").  Plaintiff Donna Fantoni
("Plaintiff") has filed a motion for summary judgment.  Defendant
Michael J. Astrue ("Defendant") has filed a motion to affirm the
decision of the Commissioner.

     This matter has been referred to me for preliminary review,
findings, and recommended disposition pursuant to 28 U.S.C. §
636(b)(1)(B).  For the reasons set forth herein, I find that the
Commissioner's decision that Plaintiff is not disabled is
supported by substantial evidence in the record.  Accordingly,

---

[1] Michael J. Astrue has been substituted for Jo Anne B.
Barnhart as Defendant in this action.  See Fed. R. Civ. P. 25(d)
("An action does not abate when a public officer who is a party in
an official capacity dies, resigns, or otherwise ceases to hold
office while the action is pending.  The officer's successor is
automatically substituted as a party.  Later proceedings should be
in the substituted party's name ...."); see also 42 U.S.C. § 405(g)
("Any action instituted in accordance with this subsection shall
survive notwithstanding any change in the person occupying the
office of Commissioner of Social Security or any vacancy in such
office.").

based on the following analysis, I recommend that Plaintiff's Motion for Summary Judgment (Document ("Doc.") #7) ("Motion for Summary Judgment") be denied and that Defendant's Motion for an Order Affirming the Decision of the Commissioner (Doc. #10) ("Motion to Affirm") be granted.

## Facts and Travel

On June 30, 1998, Plaintiff filed an application for DIB, alleging disability since April 1, 1997, (Record ("R.") at 126), due to fibromyalgia, anxiety, depression, and mitral valve prolapse, (R. at 135).  Her application was denied initially, (R. at 60-63), and upon reconsideration, (R. at 65-68).  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (R. at 111)  On April 21, 2003, an ALJ conducted a hearing at which Plaintiff, who was represented by counsel, and a vocational expert ("VE"), testified.  (R. at 26-57)  The ALJ issued a decision on September 23, 2003, finding that Plaintiff was not disabled.  (R. at 18-25)  Plaintiff requested that the Appeals Council review the decision, (R. at 14), but on November 14, 2003, the Appeals Council denied review, (R. at 11-13).

Plaintiff then sought judicial review on January 12, 2004, by filing an action in this Court.  (R. at 316)  On June 28, 2004, Defendant filed a motion seeking to have the case remanded to the Commissioner pursuant to Sentence Four of 42 U.S.C. § 405(g).  (R. at 317, 321)  In a Memorandum and Order issued on July 9, 2004 ("Order of 7/9/04"), this Magistrate Judge granted the motion and remanded the matter to the Commissioner for administrative proceedings.  (R. at 319-24)

On August 18, 2004, the Appeals Council remanded Plaintiff's case to the ALJ.  (R. at 325-27)  The ALJ conducted a second hearing on January 20, 2005, at which Plaintiff and a medical expert ("ME"), Stuart Gitlow, M.D., a board certified psychiatrist, testified.  (R. at 433-68)  On March 25, 2005, the

2

ALJ issued a decision finding that Plaintiff was not disabled during the relevant period.  (R. at 305-14)

Plaintiff again sought review by the Appeals Council, (R. at 300-01), but this request was denied on November 4, 2006, making the ALJ's decision the final decision of the Commissioner.  (R. at 294-97)  Plaintiff thereafter filed this action for judicial review.

## Issue

The issue for determination is whether there is substantial evidence in the record to support the decision of the Commissioner that Plaintiff was not disabled within the meaning of the Act.

## Standard of Review

The Court's role in reviewing the Commissioner's decision is limited.  Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999).  Although questions of law are reviewed de novo, the Commissioner's findings of fact, if supported by substantial evidence in the record,[2] are conclusive.  Id. (citing 42 U.S.C. § 405(g)).  The determination of substantiality is based upon an evaluation of the record as a whole.  Id. (citing Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1999)("We must uphold the [Commissioner's] findings ... if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.")(second alteration in original)).  The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the

---

[2] The Supreme Court has defined substantial evidence as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971)(quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217 (1938)); see also Suranie v. Sullivan, 787 F.Supp. 287, 289 (D.R.I. 1992).

Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health &
Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)).  "Indeed, the
resolution of conflicts in the evidence is for the Commissioner,
not the courts."  Id. at 31 (citing Rodriguez v. Sec'y of Health
& Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)(citing
Richardson v. Perales, 402 U.S. 389, 399, 91 S.Ct. 1420, 1426
(1971))).

## Law

To qualify for DIB, a claimant must meet certain insured
status requirements,[4] be younger than sixty-five years of age,
file an application for benefits, and be under a disability as
defined by the Act.  See 42 U.S.C. § 423(a).  The Act defines
disability as the "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than 12 months ...."  42 U.S.C. §
423(d)(1)(A).  A claimant's impairment must be of such severity
that she is unable to perform her previous work or any other kind
of substantial gainful employment which exists in the national
economy.  See 42 U.S.C. § 423(d)(2)(A).  "An impairment or
combination of impairments is not severe if it does not
significantly limit [a claimant's] physical or mental ability to
do basic work activities."[5]  20 C.F.R. § 404.1521(a) (2008).  A

---

[4] Plaintiff's date last insured is March 31, 2001.  (R. at 306,
312)

[5] Section 404.1521 describes "basic work activities" as "the
abilities and aptitudes necessary to do most jobs."  20 C.F.R. §
404.1521(b) (2008).  Examples of these include:

   (1) Physical functions such as walking, standing,
   sitting, lifting, pushing, pulling, reaching, carrying,
   or handling;
   (2) Capacities for seeing, hearing, and speaking;
   (3) Understanding, carrying out, and remembering simple

4

claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986).

The Social Security regulations prescribe a five-step inquiry for use in determining whether a claimant is disabled. See 20 C.F.R. § 404.1520(a) (2008); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987); Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001). Pursuant to that scheme, the Commissioner must determine sequentially: (1) whether the claimant is presently engaged in substantial gainful work activity; (2) whether she has a severe impairment; (3) whether her impairment meets or equals one of the Commissioner's listed impairments; (4) whether she is able to perform her past relevant work; and (5) whether she remains capable of performing any work within the economy. See 20 C.F.R. § 404.1520(b)-(g). The evaluation may be terminated at any step. See Seavey, 276 F.3d at 4. "The applicant has the burden of production and proof at the first four steps of the process. If the applicant has met his or her burden at the first four steps, the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform." Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).

**ALJ's Decision**

Following the familiar sequential analysis, the ALJ in the instant case made the following findings: that Plaintiff had not engaged in substantial gainful activity since April 1, 1997, (R.

---

instructions;
(4) Use of judgment;
(5) Responding appropriately to supervision, co-workers and usual work situations; and
(6) Dealing with changes in a routine work setting.

Id.

at 312); that Plaintiff's fibromyalgia with chronic pain and
secondary expected levels of depression was severe but did not
meet or equal any listed impairment, (id.); that the degree of
incapacity asserted by Plaintiff resulting from her impairments
was not consistent with the record considered as a whole prior to
the lapse of disability insured status on March 31, 2001, (R. at
313); that prior to the lapse of her insured status on March 31,
2001, Plaintiff had the residual functional capacity ("RFC") to
perform the physical exertional and nonexertional requirements of
work except for an inability to lift and carry over 20 pounds,
with a moderate restriction in the ability to maintain attention
and concentration and a moderate restriction in the ability to
deal with the ordinary requirements of attendance, perseverance
and pace, (id.); that Plaintiff was unable to perform her past
relevant work, (id.); that Plaintiff's RFC for the full range of
light work was reduced by a moderate restriction in the ability
to maintain attention and concentration and by a moderate
restriction in the ability to deal with the ordinary requirements
of attendance, perseverance and pace, (id.); that a significant
number of jobs existed in the national and regional economies
which Plaintiff could perform, (id.); and that Plaintiff was not
under a "disability" prior to the lapse of her disability insured
status on March 31, 2001, (id.).

### Errors Claimed

Plaintiff alleges that 1) the ALJ failed to comply with the
Order of 7/9/04, remanding Plaintiff's case, and 2) the ALJ
failed to follow the proper standards for pain evaluation
pursuant to Avery v. Secretary of Health & Human Services, 797
F.2d 19, (1st Cir. 1986), and Social Security Ruling ("SSR") 96-
7p, 1996 WL 374186 (S.S.A.).

**Discussion**

## I.  Compliance with the Order of 7/9/04

Plaintiff appears to argue that the ALJ failed to comply with this Magistrate Judge's Order of 7/9/04 in five respects.[6] That order provided in relevant part:

> On remand ... the Commissioner will instruct an ALJ to: 1) reevaluate the state agency psychologist's medical opinion and provide a rationale for the weight given to it; 2) obtain evidence from a medical expert to assist in determining the severity of Plaintiff's impairments for the relevant period; 3) provide an appropriate evaluation of Plaintiff's mental impairments as required by 20 C.F.R. § 404.1520a; 4) reevaluate Plaintiff's credibility based on the evidence of record; 5) reassess Plaintiff's RFC; and 6) proceed through steps four and five of the sequential evaluation process, obtaining VE testimony if necessary.

(R. at 322)(footnote omitted).

### A.  State agency psychologist's medical opinion

Although Plaintiff indicates that she is challenging the ALJ's compliance with the first of the above stated requirements,

---

[6] Plaintiff's memorandum fails to comply with the Local Rules, hindering identification and comprehension of her arguments.  The spacing varies from single to double, and the font varies from 12-point to 10-point, both without discernable purpose.  Local Rule Cv 7(d)(1) requires that memoranda be double-spaced and printed in 12-point font.  Also problematic is Plaintiff's non-consecutive numbering of sections and inconsistent format.  See Plaintiff's Memorandum in Support of Her Motion for Summary Judgment ("Plaintiff's Mem.") at 4, 6, 10, 14, 16-18.  With respect to the latter, Plaintiff's abrupt shift at page 17 to indentation, use of Roman numerals, and underlining of paragraphs is confusing.  The first indented paragraph is numbered III, but there are no preceding indented, underlined paragraphs I or II.  See id. at 16-17.  The Roman numerals used also do not correspond to the parts of the Order of 7/9/04 being discussed.  See id. at 17-18.  Finally, the Local Rules require that Plaintiff provide citations to the record, see DRI LR Cv 7(d)(4), but in paragraph VI Plaintiff fails to identify the testimony which she argues the ALJ ignored.  See id. at 18.  These deficiencies made the Court's work more difficult.  The attention of Plaintiff's counsel is, accordingly, directed to the Local Rules.

see Plaintiff's Mem. at 16-17, her primary argument (advanced in connection with this aspect of the Order of 7/9/04) appears to be that the ALJ erred in failing to find that her depression was a severe impairment prior to the expiration of her insured status, see id., and, relatedly, that the ALJ "fail[ed] to properly weigh the opinions of the plaintiff's treating sources that were not medical doctors or Ph.D.'s as required by Social Security Ruling 06-03p," id. at 17.  Recognizing that the ALJ apparently relied upon the opinion of the ME in concluding that Plaintiff's depression was not severe prior to March 31, 2001, Plaintiff faults the ME in a footnote for allegedly "repeatedly indicat[ing] that he does not consider the opinions of the plaintiff's treating sources who are not physicians or psychologists ...."  Id. at 17 n.2 (citing R. at 441-46, 448-50, 453-54).  Plaintiff implies that the ME erroneously failed to consider relevant evidence and that the ALJ, in turn, erred by accepting the ME's opinion.  The Court disagrees.

The ALJ found that the:

> record does not support a conclusion that the claimant has "depression" as a severe, medically determinable impairment at any time up to the expiration of the claimant's disability insured status on March 31, 2001: While there is evidence that she experiences depressive symptoms, the record as a whole supports a conclusion that the mood symptoms the claimant experienced were secondary to her fibromyalgia and related.

(R. at 309 n.5)  In making this finding, it is clear that the ALJ relied upon the opinion of the ME.  In recounting the ME's testimony, the ALJ stated:

> [The ME] indicated that there was virtually no information from any physician regarding any psychiatric impairment other than reference to depressive symptoms secondary to reported pain (pain for which, it is noted, the claimant receives no treatment).  [The ME] continued by noting that the claimant's primary diagnosis is

> fibromyalgia, a condition which[] often carries
> depressive symptoms and that further, according to some
> literature[,] is actually a variation of depression.
> [The ME] stated that the current status of this issue
> (i.e., the relationship between fibromyalgia and symptoms
> of depression) remains under debate.   In further
> discussing the record, he opined that the most accurate
> diagnosis (at least for the period prior to the lapse of
> disability insured status in March of 2001) was
> fibromyalgia with chronic pain and with expected levels
> of depressive symptoms.

(R. at 310)(footnote omitted).  The ALJ accurately described the
ME's testimony, (R. at 439-55 (especially R. at 441-42)), and the
Court sees no error in the ALJ's decision to rely upon this
opinion in finding that Plaintiff's depression was not a severe
impairment prior to the expiration of her insured status.

Plaintiff's assertion that the ME did not consider the
opinions of Plaintiff's treating sources who were not physicians
or psychologists mis-characterizes his testimony.  At the hearing
Plaintiff's counsel asked the ME if the severity of symptoms
described by "Dr. Boul[ay]," (R. at 448), were consistent with
symptoms observed by Cynthia P. Longway, P.C.N.S.[7] ("Nurse
Longway"), (id.), who began to treat Plaintiff in February 2004,
(R. at 394).  The ME responded by noting that Mr. Boulay was not
a doctor, (R. at 448), and indicating that he considered Mr.
Boulay to be an "observer," (id.).  The ME did agree with
Plaintiff's counsel that it was "perfectly possible," (R. at
449), that Mr. Boulay was capable of making the kinds of
observations he reported in April 2003, namely that Plaintiff
had:

> intense anxiety, especially severe in social situations,
> difficulty leaving the house, social withdrawal, hyper-
> sensitivity, [and] ... that her symptoms are severe and ... that
> she had at least moderately severe limitations in the ability to

---

[7] The initials "PCNS," (R. at 430), presumably mean Psychiatric
Clinical Nurse Specialist.

9

respond appropriately to coworkers, [and] severe limitations in the ability to respond to customary work pressures.

(R. at 448 (citing R. at 267, 269-70)).  However, the ME rejected counsel's proposition that the observations of Mr. Boulay and Nurse Longway were "potentially as valid as [the ME's:]"

> I think that's not possible.  I, these are, these are individuals who may have a Bachelor's level training or perhaps a little more.  I do not think it's possible that their judgement and observational skills are as good as what we would find [at] a doctoral level.  I think that they, they may have insight and they may be able to, to reflect upon that insight, but I do not take it as, as seriously as I would medical judgment.

(R. at 449)

Thus, contrary to Plaintiff's assertion, the ME did not indicate that he disregarded the opinions of Plaintiff's treating sources who were not physicians or psychologists.  Rather, he indicated that he simply did not attach the same weight to those opinions as he would to opinions rendered by medical doctors and other professionals holding Ph.D. degrees.

With respect to Plaintiff's charge that the ALJ failed to properly weigh the opinions of Plaintiff's treating sources who were not medical doctors or Ph.D.'s in accordance with SSR 06-03p, this ruling was not in existence when the ALJ issued his decision on March 25, 2005, (R. at 314).  Accordingly, this Court would not recommend remand based on alleged non-compliance with a ruling which did not exist at the time the ALJ made his determination.[8]

Moreover, the Court finds no error in the ALJ's consideration of the evidence from Plaintiff's treating sources who were neither medical doctors nor holders of doctoral degrees.

---

[8] SSR 06-03p was issued August 9, 2006.

The ALJ considered the evidence from Albert Snow ("Mr. Snow"),[9] the only non-medical source who treated Plaintiff prior to the expiration of her insured status on March 31, 2001.  (R. at 306) The ALJ noted that Mr. Snow reported in October of 1998 that he had treated Plaintiff since February 1996 for chronic fatigue syndrome, hypoglycemia, and depression, utilizing nutritional therapy and herbal and other supplements, and that Plaintiff had not improved.  (R. at 306 (citing R. at 177))  Significantly, the ALJ also noted that Mr. Snow had provided no treatment notes or examination findings, (id.), a factor relevant in determining the weight to be given to this non-medical source.[10]

The ALJ also considered the evidence from Guy M. Boulay, C.A.G.S.[11] ("Mr. Boulay"), who began seeing Plaintiff in February 2002, eleven months after her date last insured.  (R. at 308-09). Over the course of two paragraphs, the ALJ discussed this evidence, (id.), writing in part that Mr. Boulay had not provided any treatment records but had indicated in an October 14, 2002, letter to Plaintiff's counsel that he had treated Plaintiff for about thirteen months for severe social anxiety which impaired her ability to function around others and sometimes to leave her

_____

[9] The initials "ND," (R. at 177), which follow Albert Snow's name presumably indicate that he is a doctor of naturopathy.  Naturopathy is a "system of therapeutics in which neither surgical nor medicinal agents are used, dependence being placed only on natural (nonmedicinal) forces."  Stedman's Medical Dictionary 1177 (26th ed. 1995).

[10] Mr. Snow indicated that he had seen Plaintiff quarterly between February 1996 and June of 1998.  (R. at 177)  His one page report reflects the following diagnoses: "1. Chronic fatigue syndrome - medium-to severe[;] 2. Hypo-Glycemia  med.[;] 3. Chronic Depression [with] OCD  med[.] to severe[.]"  Id.  He opined that: "[Plaintiff] may need medical [with] psychological treatment[.]  [Plaintiff] is not able to do physical or mental work for more than 1 hr at a time.  I suggest 12-18 months - rest [with] psych. counselling[.]"  (Id.)

[11] Certificate of Advanced Graduate Studies.  (R. at 444)

11

home, (id. (citing R. at 253)).  In addition, the ALJ recounted
Mr. Boulay's opinion, expressed in a form prepared for
Plaintiff's counsel, that Plaintiff's diagnoses included social
phobia and generalized anxiety disorder which caused moderately
severe to severe restrictions in her ability to get along with
others and co-workers and to complete daily activities and
interests.  (R. at 309 (citing R. at 269-70))

The ALJ was not required to accept the opinions of either
Mr. Snow or Mr. Boulay.  See 20 C.F.R. § 404.1513(e)(providing
that evidence from other sources, such as naturopaths, "must be
complete and detailed enough to allow us to make a determination
or decision about whether you are disabled"); Gleave v. Barnhart,
76 Fed. Appx. 142, 144, 2003 WL 22171488, at *1 (9th Cir. Sept.
17, 2003)(holding that ALJ permissibly rejected naturopath's
opinion due to incomplete notes).  Although the ALJ did not
discuss Nurse Longway's opinion, she did not begin treating
Plaintiff until February 11, 2004, (R. at 429), almost three
years after the expiration of Plaintiff's insured status.[12]
Moreover, "an ALJ's written decision need not directly address
every piece of evidence in the administrative record."  Lord v.
Apfel, 114 F.Supp.2d 3, 13 (D.N.H. July 27, 2000).

Turning to the opinion of the state agency psychologist, J.
Stephen Clifford, Ph.D. ("Dr. Clifford"), he opined in September
2000 that Plaintiff had depression and anxiety and that she

---

[12] The ME discussed at length the notes from Cynthia Longway,
P.C.N.S., who began treating Plaintiff in February 2004.  (R. at 444-
47)  He noted that Plaintiff was given Valium for eleven months while
treating with Nurse Longway and that her notes did not reflect any
physician oversight.  (R. at 444-45)  The ME opined that, given
Plaintiff's use of alcohol and family history of alcoholism, "the
ongoing use of Valium, particularly[] since the claimant is noted ...
to have one drink of alcohol per day ... would always be contra-
indicated," (R. at 445), because it "could certainly lead to a
worsening of anxiety symptoms," (id.).

experienced insomnia, fatigue, loss of energy, and some irritability. (R. at 247)  Dr. Clifford indicated by checkmarks that Plaintiff was moderately limited in her ability to: 1) carry out detailed instructions due to fatigue, (R. at 245); 2) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, (R. at 246); and 3) to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, (id.). Somewhat inconsistently (with respect to the second limitation), Dr. Clifford also wrote that Plaintiff "will ... tire quickly. Work pace would be slow & she'd need breaks about every 1 hr. She'd be prone to unintentionally falling asleep on the job." (R. at 247)  He provided no explanation for this assessment, but it appears to be based on Mr. Snow's October 1998 one page report which indicated that Plaintiff was "not able to do physical or mental work for more than 1 hr at a time." (R. at 177)  Given the lack of treatment notes or examination findings from Mr. Snow, the one hour time limitation between breaks expressed in Dr. Clifford's opinion is not well supported and is inconsistent with the other substantial evidence in the record.

As previously noted, the ALJ found that Plaintiff had depressive symptoms that were secondary to her fibromyalgia. (R. at 309 n.5)  He relied upon the ME's testimony for this finding, (R. at 310), and the ME testified that the record did not reflect "any evidence that there is ongoing functional impairment secondary to the psychiatric symptoms that are present," (R. at 446).  The ALJ could reasonably rely upon the testimony of the ME, who reviewed the entire record and heard Plaintiff's testimony, over Dr. Clifford's conclusionary opinions.

Moreover, regardless of whether Plaintiff's depressive symptoms stemmed from her fibromyalgia or from a separate mental

13

impairment, Dr. Clifford's opinions as to Plaintiff's functional limitations, at least as expressed by his checkmarks on the Mental Residual Functional Capacity Assessment, (R. at 245-46), are not significantly inconsistent with the ALJ's RFC finding, (R. at 311)(finding that Plaintiff retains the capacity for light work with a moderate restriction in the ability to maintain attention and concentration and a moderate restriction in the ability to deal with the ordinary requirements of attendance, perseverance and pace). The ALJ based this finding on all of the evidence, "including the testimony of the claimant and the medical expert, the updated evidence, and the assessments of the non-examining physician reviewers at the initial and reconsideration levels ...." (R. at 311)

The ALJ's mental RFC limitations are supported by the opinions of James P. Curran, Ph.D. ("Dr. Curran"), (R. at 206), and John E. Murphy, Ph.D. ("Dr. Murphy"), (R. at 221-22), each of whom examined Plaintiff during the period at issue and opined that she could follow simple instructions and would not have difficulty getting along with others,[13] (R. at 206, 221). They are also supported by reviewing psychologist Harold R. Musiker, Ph.D. ("Dr. Musiker"). (R. at 214, 216) Thus, substantial evidence supports the ALJ's finding as to the severity of Plaintiff's depression and mental RFC.

Finally, while the ALJ could have been more explicit in addressing Dr. Clifford's opinion, remand is not required where the Court is satisfied that the ultimate result would be the same. See Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989)

---

[13] Dr. Murphy opined that Plaintiff would "appear to be able to get along with peers; however, she did explain that when she becomes tired, she becomes irritable, and this may create some difficulties with peers in the workplace. She otherwise appeared to be a pleasant woman and an easy person with whom to get along." (R. at 221) The Court does not consider this assessment to be inconsistent with the ALJ's RFC finding.

14

("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."); see also Dantran v. U.S. Dep't of Labor, 171 F.3d 58, 73 (1st Cir. 1999)(holding that remand "is not essential if remand will amount to no more than an empty exercise"). Accordingly, to the extent that Plaintiff seeks remand because the ALJ allegedly failed to reevaluate Dr. Clifford's opinion, Plaintiff's argument is rejected.

### B.  Medical Expert's Evidence

Plaintiff argues that the ALJ did not call a medical expert who was qualified to opine on Plaintiff's limitations resulting from fibromyalgia and pain and that, therefore, he failed to comply with the Court's order.  In support of this argument, Plaintiff posits that the ME testified that Plaintiff's primary impairment was fibromyalgia and pain, see Plaintiff's Mem. at 17 (citing R. at 445-46), and further testified that he was not qualified to opine on Plaintiff's limitations resulting from fibromyalgia and pain,[14] id. (citing R. at 446).

The short answer to this argument is that the Order of 7/9/04 did not require that the ALJ obtain evidence from a particular type of medical expert.  (R. at 322)  In this case,

---

[14] Plaintiff apparently bases this statement on the following testimony by the ME (which appears to have been given in connection with the ME's assessment of Nurse Longway's notes from 2004-2005):

> Overall, the, the picture appears to indicate, and I say appears on purpose given, given the lack of any degree of physician oversight, at least, documented here, appears to be a picture of fibromyalgia with chronic pain and a reasonable amount of depression that one would expect to arise in an individual who was experiencing chronic pain.  I don't see any evidence that there is ongoing functional impairment secondary to the psychiatric symptoms that are present.  There may be difficulties secondary to the pain.  That's outside my area.

(R. at 445-46)

15

the Commissioner voluntarily sought remand, see Order of 7/9/04
at 1 (R. at 319), and the Commissioner's own remand instructions,
as expressed by the Appeals Council, ordered the ALJ obtain
testimony from "a medical expert (mental health specialist) who
will be asked to furnish a longitudinal assessment of the
claimant's mental impairment including whether the claimant has
an impairment which meets or equals the listings," (R. at 326).
In compliance with this directive, the ALJ obtained testimony
from a ME who was board certified in psychiatry, (R. at 439), and
who testified that he saw no evidence in his review of
Plaintiff's records of any "ongoing functional impairment
secondary to the psychiatric symptoms that are present," (R. at
446).  The Court is satisfied the ALJ complied with the second
requirement of the Order of 7/9/04.  Plaintiff's argument to the
contrary is, therefore, rejected.

### C.  Evaluation of Plaintiff's mental impairments

Plaintiff complains that the ALJ did not order a post-
hearing consultative evaluation to address Plaintiff's obsessive
compulsive disorder ("OCD").  While the ALJ raised such an
evaluation as a possibility during the hearing, (R. at 467), he
indicated that he wanted to consider the matter further before
deciding to order it.[15]  The Court sees no error in the fact that
the ALJ ultimately decided that such examination was unnecessary.

Although Plaintiff testified at the second hearing that her
OCD traits had been going on "[a] long time.  Since I can
remember," (R. at 461), and the ME testified that individuals
with OCD do not tend to have periods in their lives when they do
not have OCD, (R. at 465), Plaintiff underwent two consultative
examinations prior to the expiration of her insured status.  In

---

[15] The ALJ noted that he had to decide whether an "additional
examination would provide the kind of information that would be useful
to me."  (R. at 467)

February 1999 she was examined by Dr. Curran who noted that she "report[ed] no symptoms consistent with an obsessive compulsive disorder." (R. at 206) A second consultative examination was performed in August 2000 by Dr. Murphy. Dr. Murphy recorded that Plaintiff "denied any experience of obsessions or compulsions, such as bothersome thoughts that she could not stop thinking about and symptoms of hand washing, counting, checking or touching behaviors. There is no evidence of a compulsive disorder." (R. at 220) The ME also testified that there was no evidence that Plaintiff had even been given either of the two medications indicated for OCD. (R. at 464)("The correct medications for [OCD], the two FDA-indicated meds for it are Luvox and Anaphanil. I don't see any evidence in the record that the claimant has been given either of those medications.").

Given that Plaintiff had already undergone two consultative examinations and that, as explained in Section II. A _infra_, the ALJ had ample reason to doubt Plaintiff's credibility on many matters, including whether and how long she had experienced symptoms of OCD, the Court finds no error in the ALJ's decision not to order a third consultative examination. Plaintiff's argument in this regard is rejected.

### D. Reevaluation of Plaintiff's credibility

Plaintiff argues that the ALJ's assessment of Plaintiff's credibility is faulty because he noted Plaintiff's non-compliance with medication, (R. at 311), but failed to mention Nurse Longway's January 2005 observation that Plaintiff has "[m]ultiple fears/obsessions about medications that have resulted in slow progress to remit [symptoms with] medicines," (R. at 429). The Court disagrees. The ALJ validly noted that Plaintiff "has been repeatedly non-compliant with the treatments offered her until quite recently," (R. at 311), and that the ME's "testimony allows a conclusion that the treatment with which the claimant _is_

17

compliant–Valium – is inappropriate," (R. at 311 n.7).  The ALJ
was not required to accept the explanation provided by Nurse
Longway's notes given the other reasons, discussed infra, to
doubt Plaintiff's credibility.  Indeed, the record shows that
Plaintiff had a history of non-compliance with virtually all
recommended treatment during the period at issue, not only
medication, but also smoking cessation, aerobic exercise,
physical therapy, and individual and group therapy.[16]  (R. at
170, 173-175, 189, 224)  As discussed in Section II. A. infra,
the ALJ's credibility determination is supported by substantial
evidence.

**E.  Plaintiff's RFC**

Plaintiff asserts that the "ALJ ignored those portions of
the medical expert['s] testimony which presented a basis for
finding additional limitations in the plaintiff's functional

---

[16] Paul Aubuchon, Ph.D. ("Dr. Aubuchon"), a clinical psychologist,
who treated Plaintiff for approximately six months beginning in April
1996, wrote on October 8, 1997: "Unfortunately, this was not a
compliant patient and she attended session in my office until her
disability benefits were up and then she did not return to see me
except for one occasion when she was in a crisis, argument with her
husband."  (R. at 170)

Similarly, Sandra V. Kristiansen, M.D. ("Dr. Kristiansen"), in a
July 16, 1998, letter, stated:

The patient did not follow-up since the prior visit of
November 11, 1997.  All of a sudden she is claiming she needs
some help because she is not working, is unable to perform her
duties, is under a lot of stress[,] and has been going to a
homeopathic individual for her treatment.  She does not have
any more money and is here to see how much I can help.  I told
her that basically most of the treatment requires physical
therapy, acupuncture, pain support group as well as some low
dose antidepressant medications, muscle relaxants[,] and
medications to help with her sleep disturbance.  **She, again,
is not interested in this type of treatment.**  She claims that
she does not want to try those treatments as suggested by me.

(R. at 174)(bold added).

18

abilities ...," Plaintiff's Mem. at 18, but fails to identify the pages on which this testimony appears.  The Court has reviewed the ME's testimony and fails to find a basis for additional limitations.  Accordingly, the Court declines to consider this argument because of Plaintiff's failure to comply with Local Rule Cv 7(d)(4)[17] and the argument's apparent lack of support in the record.

Plaintiff also repeats in connection with this argument her complaints that the ALJ failed to request a post-hearing evaluation to assess her functional limitations and allegedly failed to call a ME who could shed light on the impact of her fibromyalgia.  The Court has already addressed these complaints in the prior sections, and it is unnecessary to repeat that discussion here.

Plaintiff's final complaint relative to the ALJ's compliance with the Order of 7/9/04 is that the ALJ "reasserted the RFC analysis from his first decision contrary to the Court's Order." Plaintiff's Mem. at 18.  The fact that the ALJ determined that Plaintiff had the same RFC as stated in the first decision does not mean that the ALJ failed to comply with the Court's order. The ALJ was free to make this determination after complying with the other parts of the order.  The ALJ's RFC determination is supported by the opinions of Dr. Curran, (R. at 206), Dr. Murphy, (R. at 221), Dr. Musiker, (R. at 214, 216), and Disability Determination Services ("DDS") reviewing physician Thomas A. Bennett, M.D. ("Dr. Bennett"), (R. at 227-34).  Plaintiff's complaint is therefore rejected.

---

[17] Local Rule Cv 7(d)(4) states: "Any memorandum filed in a case involving an appeal from the ruling or determination of an administrative tribunal, including but not limited to Social Security disability determinations, shall include all pertinent citations to the administrative record."  DRI LR Cv 7(d)(4).

## II.  Compliance with <u>Avery</u> and SSR 96-7p

### A.  Credibility

Plaintiff argues that the ALJ failed to make any findings regarding Plaintiff's credibility and the consistency of her pain in violation of <u>Avery</u> and SSR 96-7p.  <u>See</u> Plaintiff's Mem. at 20. The ALJ found that "[t]he degree of incapacity asserted by the claimant as resulting from her impairments is not consistent with the record considered as a whole prior to the lapse of disability insured status on March 31, 2001."  (R. at 313)  While the ALJ could have been more explicit in stating his credibility finding and identifying the reasons for it, the Court has little difficulty determining from the decision the ALJ's reasons for finding Plaintiff less than fully credible.

The ALJ noted the inconsistency of Plaintiff's own statements, especially in regard to her use of alcohol.  <u>See</u> SSR 96-7p, 1996 WL 374186, at *5 ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."); <u>see also</u> <u>Verduzco v. Apfel</u>, 188 F.3d 1087, 1090 (9th Cir 1999) (holding that ALJ properly relied upon inconsistent statements about alcohol use as a basis for rejecting plaintiff's testimony).  The ALJ cited the following evidence: that Paul Aubuchon, Ph.D. ("Dr. Aubuchon"), a clinical psychologist, who treated Plaintiff from approximately April to October of 1996, determined that Plaintiff was "drinking to excess ...,"[18] (R. at

---

[18] Dr. Aubuchon wrote in an October 8, 1997, letter:

In addition to the depression and anxiety she is experiencing, apparently she was drinking to excess and hiding it.  When it was finally discovered that she was drinking to excess this issue was addressed but the patient utilized a lot of denial and did not want to address this issue by participation in Alcoholics Anonymous.

(R. at 169)

306); see also (R. at 169); that Dr. Curran reported in February 1999 that it was possible that Plaintiff was underreporting her current use of alcohol,[19] (R. at 307); see also (R. at 205); that on August 17, 2000, Plaintiff denied any present or past use of alcohol when she was examined by Dr. Murphy at the request of DDS, (R. at 307); see also (R. at 218);[20] that Plaintiff told Zaheer A. Shah, M.D. ("Dr. Shah"), that she drank alcohol nightly and more heavily on the weekends for the last twenty years;[21] (R. at 308); see also (R. at 277); and that she told Nurse Longway in February 2004 that she drank five mixed drinks on Saturdays and wine with dinner;[22] (R. at 309); see also (R. at 399).  After

---

[19] Dr. Curran stated in his February 8, 1999, report:

The examiner asked her about her alcohol intake, seeing that she had two DWI's.  She said that now she is only a social drinker.  She said that she drinks sometimes when she goes out or with friends.  She said yesterday during the Superbowl she had four drinks.  She admits that she used to drink more than that in her 20's where she would drink other stuff besides wine.  She now tends to just drink wine ....  She also admits to having blackouts when she did drink considerably more than what she drinks now.  Given the fact that she has had two DWI's, it is possible that she is underestimating her alcohol intake at present or perhaps she has learned her lesson, that was about five years ago.

(R. at 205)

[20] Dr. Murphy wrote in August 2000: "The Claimant drinks alcohol minimally and in small quantities when she does drink.  There is no pattern to her alcohol use.  She has no history of drug or alcohol abuse ...."  (R. at 221)

[21] Dr. Shah's note regarding Plaintiff's alcohol use states: "nightly[;] weekends a lot!! x 20 yrs[.]"  (R. at 277)  In contrast, Plaintiff told Dr. Romano in September 1997 that her use of alcohol was only "[o]ccasional," (R. at 178), and she denied that anyone had ever told her to cut down on her drinking, (R. at 183).

[22] Under the heading "Substance Abuse," Nurse Longway's February 11, 2004, notes state: "drinks alcohol, (weekend 5 mixed drinks Saturday[;] glass wine [with] dinner) Sunday also drinks[,] sometimes 2

citing this evidence, the ALJ wrote: "There are ... a number of
references in the record to the claimant using alcohol to excess,
or of her significantly underestimating the amount of alcohol she
used (and possibly affecting the efficacy of medical care she did
receive due to her lack of honesty) ...."  (R. at 311)

The ALJ also noted that Plaintiff gave conflicting accounts
of her childhood.  (R. at 307 n.2)   She told Dr. Murphy that she
had a "somewhat difficult childhood ... her father drank alcohol
excessively ... her parents argued a great deal."  (R. at 217-18)
Yet, Plaintiff reported to Dr. Curran that she had "a good
childhood with wonderful parents."  (R. at 204)

Similar discrepancies relative to Plaintiff's claim of OCD
were cited by the ALJ.  (R. at 307, 308, 310 n.6)   Plaintiff
testified that her OCD symptoms had been going on "[a] long time.
Since I can remember," (R. at 461).  However, the ALJ noted that
she had denied such symptoms to both Dr. Curran and Dr. Murphy.
(R. at 307)("Dr. Curran specifically indicated that she did not
endorse any symptoms consistent with an obsessive compulsive
disorder."); (R. at 308)("The claimant specifically denied [to
Dr. Murphy] any experience of obsessions or compulsions,
including thoughts she could not stop thinking about, hand
washing, counting, or checking.); see also (R. at 206, 220).
Plaintiff's testimony that she must do some things three times,
(R. at 460), that at times she finds herself counting, (id.), and
that for "[a] few years," (R. at 463), the sight of unfolded
laundry makes her nervous, (R. at 462), is directly at odds with
her denials to Drs. Curran and Murphy regarding such traits.

The ALJ also observed that Plaintiff had not been compliant
with recommended treatment.  (R. at 306)(quoting Dr. Aubuchon's
report that "this was not a compliant patient and she attended

_____

– (drinks to relax)."  (R. at 399)

22

sessions ... only until her disability benefits were up.")
(alteration in original); (R. at 306)(citing Dr. Kristiansen's
statement that Plaintiff "did not want any treatment despite
recommendations for exercise, improved sleep pattern, and stress
relief intervention"); (R. at 307)(noting that Plaintiff "never
participated" in a program of physical therapy, aerobic
conditioning, medication, and a support group as recommended by
Dr. Quinn); (R. at 308)("Dr. Kristiansen noted the claimant's
noncompliance in any of the recommended activities ...."); (R. at
309)(noting Mr. Boulay's observation that Plaintiff had tried a
number of medications in the past and did not wish to try any
others at this time); (R. at 309)(indicating that Plaintiff
"repeatedly cancelled appointments including for referrals" made
by Dr. Karavasilis); (R. at 311)("the claimant has been
repeatedly non-compliant with the treatments offered her until
quite recently"); <u>see also</u> (R. at 170, 173-74, 224, 254, 381).

     In addition, the ALJ noted that there were substantial
periods of time during which Plaintiff sought no treatment.  (R.
at 306)(quoting Dr. Kristiansen's July 1998 report that "All of
[a] sudden [after a lapse of seven months, Plaintiff] is claiming
she needs some help because she is not working ...")(quoting R.
at 174); (R. at 307)("There are no treatment records for 1999.");
(R. at 308)(noting that there no records of treatment between
August 22, 2000, and May of 2001); (<u>id.</u>)("There are no records
for the remainder of 2001 [after an annual physical on June
20].");  (R. at 309)(noting that, apart from counseling sessions
with Mr. Boulay, there is no evidence that Plaintiff had any
medical treatment or counseling in 2002 other than an emergency
room visit for stress after an incident with her husband in
December, 2002); (<u>id.</u>)(observing that "[t]here are no further
treatment notes for 2003" after Plaintiff's April 2003 visit with
Dr. Shah); (R. at 311)("the claimant's records reflect not only

non-compliance, but significant periods where she received
virtually no treatment at all, i.e., for essentially all of 1999
and into mid-2000, and from August, 2000, until May, 2001"); cf.
SSR 96-7p, 1996 WL 374186, at *7 ("the individual's statements
may be less credible if the level or frequency of treatment is
inconsistent with the level of complaints, or if the medical
reports show that the individual is not following the treatment
as prescribed and there are no good reasons for this failure");
see also Irlanda Ortiz v. Sec'y of Health & Human Servs., 955
F.2d 765, 770 (1st Cir. 1991)(noting that the regulations require
that, in order to qualify for benefits, a claimant must follow
prescribed treatment and stating that "[i]mplicit in a finding of
disability is a determination that existing treatment
alternatives would not restore a claimant's ability to work")
(alteration in original).

In sum, the ALJ described in great detail the evidence in
this case.  The reasons why he found Plaintiff to be less than
fully credible can be readily discerned from that recitation.
Plaintiff's claim of error relative to that determination is,
therefore, rejected.  Cf. Frustaglia v. Sec'y of Health & Human
Servs., 829 F.2d 192, 195 (1st Cir. 1987)("Although more express
findings, regarding head pain and credibility, than those given
here are preferable, we have examined the entire record and their
adequacy is supported by substantial evidence.").

**B.  <u>Avery</u>**

<u>Avery</u> requires an ALJ to investigate "all avenues presented
that relate to subjective complaints ...."  797 F.2d at 28.  The
Court of Appeals for the First Circuit in <u>Avery</u> listed the
following factors to be considered:

> 1.  The nature, location, onset, duration, frequency,
> radiation, and intensity of any pain;

> 2. Precipitating and aggravating factors (e.g.,
> movement, activity, environmental conditions);
> 3. Type, dosage, effectiveness, and adverse side-
> effects of any pain medication;
> 4. Treatment, other than medication, for relief of
> pain;
> 5. Functional restrictions; and
> 6. The claimant's daily activities.

Id. at 29; see also 20 C.F.R. § 404.1529(c)(3) (2008) (listing
factors relevant to symptoms, such as pain, to be considered);
SSR 96-7p, 1996 WL 374186, at *3 (same).

> In instances in which the adjudicator has observed the
> individual, the adjudicator is not free to accept or
> reject that individual's subjective complaints solely on
> the basis of such personal observations. Rather, in all
> cases in which pain is alleged, the determination
> rationale is to contain a thorough discussion and
> analysis of the objective medical and nonmedical
> evidence, including the individual's subjective
> complaints and the adjudicator's personal observations.

Avery, 797 F.2d at 29. In addition, "whenever the individual's
statements about the intensity, persistence, or functionally
limiting effects of pain or other symptoms are not substantiated
by objective medical evidence, the adjudicator must make a
finding on the credibility of the individual's statements based
on a consideration of the entire case record." SSR 96-7p, 1996
WL 374186, at *2. "The credibility determination by the ALJ, who
observed the claimant, evaluated his demeanor, and considered how
that testimony fit in with the rest of the evidence, is entitled
to deference, especially when supported by specific findings."
Frustaglia, 829 F.2d at 195; see also Yongo v. INS, 355 F.3d 27,
32 (1st Cir. 2004)("[T]he ALJ, like any fact-finder who hears the
witnesses, gets a lot of deference on credibility judgments.");
Irlanda Ortiz, 955 F.2d at 769 ("It is the responsibility of the
Secretary to determine issues of credibility and to draw
inferences from the record evidence."); Suarez v. Sec'y of Health

& Human Servs., 740 F.2d 1 (1st Cir. 1984)(stating that ALJ is "empowered to make credibility determinations ...").

At the outset, it bears noting that Plaintiff did not testify at either hearing that she was unable to work because of pain:

Q    I'd like you to tell me why you feel you're not able to do any kind of work during this period?

A    I have nonstop worrying, overwhelming anxiety about little things.  And the big things, I have trouble handling.  And it prevents me from functioning, functioning normally every day. And it's, it's just a chore for -- to leave the house, sometimes.

(R. at 36)(first hearing).

Q    Ms. Fantoni, can you tell us why you think you can't work?

A    The anxiety and depression are overwhelming.  I have a fear of social situations, supermarkets, just leaving my house.  **Everyone is focusing on pain.  I don't consider that what's stopping me from working.**

(R. at 455-56)(second hearing)(bold added).

Similarly, when questioned about why she stopped working in 1996, Plaintiff indicated that pain was not a determinative factor.

Q    Okay.  And at that time were you, you, you know that we've been talking about fibromyalgia and pain, were you having problems with pain at that time as well?

A    Yes, but the anxiety and the depression were overwhelming that.

Q    Okay.

A    I could live with the pain but the anxiety and depression –

Q      So it was really the combination of things.

A      Yes.

(R. at 458-59)[23]

Given these circumstances, the Court is satisfied that the ALJ adequately complied with <u>Avery</u> in this case.  At the first hearing, the ALJ asked: if Plaintiff was taking any medication, (R. at 36); what medications she had taken in the past, (R. at 39-40); if she was receiving treatment from anyone other than Mr. Boulay (at that time) on a regular basis,[24] (R. at 37); how she spent her days, (<u>id.</u>); how often she went anywhere, (<u>id.</u>); what housework she performed, (R. at 38); whether she cooked, (<u>id.</u>); who did the food shopping, (<u>id.</u>); whether she drove, (<u>id.</u>); how long she could be on her feet on a good or bad day, (<u>id.</u>); how many good days she had, (<u>id.</u>); whether she had difficulty sitting for extended periods of time,[25] (R. at 39); how much she could carry, (<u>id.</u>); the location of her pain, (R. at 41); and what, if anything, she took for the pain,[26] (<u>id.</u>).  In addition, Plaintiff was questioned by her attorney about how many hours she slept each night.  (R. at 44-45)  Plaintiff's attorney did not ask any questions about pain.  (R. at 42-45)

---

[23] Also at the second hearing, Plaintiff testified that she stopped working because: "I was unable to function at my job.  I was coming in late a lot because I wasn't sleeping.  I was falling asleep at the job."  (R. at 458)

[24] Plaintiff answered that she was not.  (R. at 37)

[25] Plaintiff's counsel asked Plaintiff whether she had difficulty sitting still.  Plaintiff responded: "Not physically.  But when I'm sitting, my mind is, is constantly thinking of something.  And I'm not relaxed sitting.  Yeah."  (R. at 44)

[26] Plaintiff testified that she took Tylenol and asprin for pain. (R. at 41)

At the second hearing on January 20, 2005, the ALJ asked how many hours Plaintiff was sleeping, (R. at 457); how she felt generally during the day, (id.); whether Plaintiff goes out with her husband, (id.), and how frequently she goes out with friends, (R. at 458).  The ALJ also questioned Plaintiff about her pain at the time she stopped working.  (R. at 458)  Plaintiff's counsel asked Plaintiff about the location of her pain, (R. at 461-462), how it affected Plaintiff, (R. at 462), and whether she ever lay down during the day to rest, (id.)  It was unnecessary for the ALJ to repeat these inquiries.

In light of Plaintiff's testimony, the Court finds that the ALJ adequately complied with the requirements of Avery.  See Frustaglia, 829 F.2d at 195 ("The ALJ thoroughly questioned the claimant regarding his daily activities, functional restrictions, medication, prior work record, and frequency and duration of the pain, in conformity with the guidelines set out in Avery regarding the evaluation of subjective symptoms.")(internal citation omitted).  To the extent that he did not, the Court is satisfied, based on Plaintiff's own testimony, that the error is harmless.  Plaintiff's second claim of error is therefore rejected.

### Summary

The ALJ complied with the requirements of the Court's Order of 7/9/04.  The ALJ also adequately complied with the requirements of Avery, and to the extent that he did not, such error was harmless.

### Conclusion

The ALJ's determination that Plaintiff was not disabled within the meaning of the Act, as amended, is supported by substantial evidence in the record and any legal error is harmless.  Accordingly, I recommend that Defendant's Motion to

Affirm be granted and that Plaintiff's Motion for Summary Judgment be denied.

Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt.  <u>See</u> Fed. R. Civ. P. 72(b); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision.  <u>See</u> <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).

/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
September 19, 2008